

**FILED**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JUN 1 8 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| J.B., a minor, A.B., a minor, and EDWIN BUSH, in his individual capacity and as father and next friend for J.B., and A.B., minors,<br><br>  Plaintiffs,<br><br>  v.<br><br>TIFFANY WOODARD, Illinois Department of Children and Family Services ("DCFS") investigator, in her individual capacity; MARCO LEONARDO, DCFS supervisor, in his individual capacity; TIERNEY STUTZ, DCFS Area Administrator, in his individual capacity; and MARC D. SMITH, Acting Director, DCFS in his official capacity,<br><br>  Defendants. | **1:19-cv-4065**<br>**Judge Sharon Johnson Coleman**<br>**Magistrate Judge M. David Weisman**<br><br><br>JURY DEMAND AS TO COUNTS II, III |

**COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND COMPENSATORY RELIEF AND PUNITIVE DAMAGES**

## I.  INTRODUCTORY STATEMENT

1.  This complaint includes a count for declaratory relief that 750 ILCS 5/607.6(d) is an overly broad restriction of speech and violates the Due Process Clause of the United States Constitution, and for a temporary, preliminary and permanent injunction barring its enforcement. This complaint further includes a two-count civil rights complaint, brought pursuant to 42 U.S.C. § 1983, arising from the actions of the Illinois Department of Children and Family Services ("DCFS") and employees and supervisors of DCFS who violated the *A.B. v. Holliman* (case 1:14-cv-07897) federal settlement agreement.

1

2. Pursuant to the *A.B. v. Holliman* agreement, DCFS inserted Policy Guide 2016.10 into Procedures 300 Appendix G and updated form CFS 1441-D, acknowledging that asking parents to give up their custodial rights without having grounds to take protective custody is coercive and violates due process rights.

3. In this case, TIFFANY WOODARD, while investigating an intentionally false and malicious complaint by Erika Bush that was ultimately unfounded, summoned the Cook County Sheriff's Office (CCSO) police at the behest of MARCO LEONARDO to attempt to coerce a safety plan at EDWIN's residence on October 3, 2018. DCFS did not perform the Child Endangerment Risk Assessment Protocol (CERAP) as required by their regulations, or even give EDWIN a CANTS-8 notice informing him what he was accused of.

4. Through the body camera footage of Officers Reillo and Williams of the CCSO police (*see* transcript attached as Exhibit A), WOODARD managed to record herself intentionally misleading the police officers into believing she was at EDWIN's residence to have a "conversation," when in fact she was attempting to remove J.B. and A.B. In addition, WOODARD recorded herself attempting to coerce a safety plan with police officers as intimidation, while repeatedly interrupting EDWIN and J.B.

5. EDWIN ejected WOODARD and Officers Williams and Reillo after WOODARD attempted to coerce a safety plan, and WOODARD refused to leave, committing trespass. Outside EDWIN's residence, WOODARD stated she was not trying to take the children into protective custody, rather she was just trying to coerce a safety plan. Moments later, Officer Williams informed WOODARD that EDWIN had the right to eject them.

6. When EDWIN repelled this illegal attempt, WOODARD retaliated by writing a letter to opposing counsel in an ongoing divorce case recommending EDWIN's parenting time with J.B. and A.B. be supervised. This October 5 letter, combined with hearsay testimony by the Guardian *ad Litem* Steve Wasko, as well as false verified pleadings and perjurious testimony of Erika Bush resulted in Associate Judge John T. Carr of the Domestic Relations Division of Cook County entering an Emergency Order of Protection on October 10, 2018.

7. On November 30, 2018, Judge Carr denied the plenary order of protection. However, Judge Carr *sua sponte* suspended EDWIN's parenting time indefinitely under 750 ILCS 5/603.10. There was no motion or pleading to suspend EDWIN's parenting time, making the November 30, 2018 Order void *ab initio* under *O'Halleran v. Harder*, 2016 ILL App. 151990. In a written June 5, 2019 opinion, Judge Timothy Murphy stated there was no notice or pleading to suspend parenting time on November 30, 2018.

8. On November 30, 2018, Judge Carr further ordered EDWIN's parenting time would be suspended until he completed the open-ended anger management counseling and the Court is "satisfied." In the November 30 Court transcript, Judge Carr stated when the counselor believed visitation is in the children's best interest, parenting time would be reinstated.

9. On December 20, 2018, Dr. John Palen was appointed to conduct the anger management counseling, and EDWIN was granted time on December 21, 2018 to visit with J.B. in Dr. Palen's office.

3

10. On December 21, 2018, in a conversation that was recorded by EDWIN, J.B. stated in Dr. Palen's office he could not remember the alleged non-incident from August 3, 2018 when asked repeatedly. J.B. had no idea why he could not see his father, said he and A.B. were crying repeatedly, said he was not scared of his father, was never harmed by his father, wanted to spend time with his father, wanted to speak to Judge Carr and WOODARD, and in fact Erika Bush had repeatedly slapped him in the face and pulled his hair.

11. 750 ILCS 5/607.6 became effective on January 1, 2017. Subsection (d) states: "All counseling sessions shall be confidential. The communications in counseling shall not be used in any manner in litigation nor relied upon by any expert appointed by the court or retained by any party."

12. As a result of 750 ILCS 5/607.6, Dr. John Palen is prevented from discussing the counseling session with J.B. and EDWIN that included J.B.'s exculpatory and heart-wrenching statements, both with the Guardian *ad Litem* and the domestic relations court. In addition, Dr. Palen was ethically conflicted from giving an opinion about J.B.'s best interest because it was derived from confidential conversations and Dr. Palen is EDWIN's counselor. Custody evaluators can give opinions as to the child's best interest, but Dr. Palen was conflicted as he was already EDWIN's counselor.

13. Judge John Carr repeatedly refused to appoint an expert to examine J.B. or A.B., and the Guardian *ad Litem* Steve Wasko was totally uninvolved in this case while the crisis continued.

4

14. On November 30, 2018, Judge John T. Carr illegally suspended EDWIN's parenting time on a void order and ordered conditions to reinstate parenting time that were legally and practically impossible to comply with.

15. J.B., A.B. and EDWIN have not had parenting time since October 3, 2018. On December 19, 2018, Dr. Palen described the lack of parenting time as a "crisis." On June 10, 209, Dr. Palen stated: "As a child therapist, I am gravely concerned about the emotional welfare of these two young children. They are at serious risk of experiencing life-long struggles with attachment the longer this situation continues…as time has evolved it seems that the children have almost become an after-thought in the eyes of the Court."

16. On June 10 and June 14, 2019, Judge John T. Carr was confronted with this information and he refused to motion to declare the November 30, 2018 order void, to reinstate parenting time or to appoint an expert to examine J.B. for the fourth time.

17. On October 10, November 6 and November 30, 2018, as well as January 10, January 24, May 2 and June 10, Judge Carr stated explicitly he was holding Plaintiff's lawful ejection of WOODARD against him, and a basis to deprive Plaintiff and the children of their fundamental due process rights.

18. Under 7th Circuit precedent, TIFFANY WOODARD, MARCO LEONARDO and TIERNEY STUTZ are personally liable under 42 U.S.C. § 1983 when they set in motion events that result in civil rights being violated. *Brokaw v. Mercer County*, 235 F.3d 1000, 1012 (7th Cir. 2000).

19. Defendants herein have acted and are acting under color of state law.

20. Defendants' actions have caused severe, including irreparable harm to Plaintiffs.

21. The Defendants' violations of Plaintiff's fundamental rights as a father are ongoing and give rise to a claim for injunctive relief as to which there is no adequate remedy at law. These violations also give rise to claims for compensatory and punitive damages.

## II.    JURISDICTION AND VENUE

22. This Court has jurisdiction over Plaintiffs' claims bought pursuant to 42 U.S.C. § 1983 and pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

23. Venue is proper in this district because:

   (a) The Northern District of Illinois is the judicial district in which substantially all of the events or omissions giving rise to Plaintiffs' claims occurred; and

   (b) Defendants are found or are employed, or at the time of the incidents giving rise to this suit were so employed, in the Northern District of Illinois.

## III.   PARTIES

24. Infant Plaintiff J.B., born in July 2011, is the son of Plaintiff. At all times prior to and after the actions complained of herein, J.B. resided with Plaintiff in unincorporated Cook County, Illinois. Pursuant to Federal Rule of Civil Procedure 17(c), Plaintiff J.B. proceeds here by his father and next friend, EDWIN BUSH.

25. Infant Plaintiff A.B., born in October 2015, is the daughter of Plaintiff. At all times prior to and after the actions complained of herein, A.B. resided with Plaintiff in unincorporated Cook County, Illinois. Pursuant to Federal Rule of Civil Procedure 17(c), Plaintiff A.B. proceeds here by her father and next friend, EDWIN BUSH.

26. Plaintiff EDWIN BUSH ("Plaintiff") is the father and next friend of infant plaintiffs J.B. and A.B.

27. Defendant TIFFANY WOODARD, at all relevant times giving rise to this complaint, was a DCFS investigator who was assigned to investigative duties involving Plaintiffs BUSH and J.B. commencing October 1, 2018. She is sued in her individual capacity.

28. Defendant MARCO LEONARDO at the time of the incidents giving rise to this complaint, was a DCFS supervisor. Defendant LEONARDO was responsible for reviewing and approving the actions of Defendant WOODARD, and did review and approve Defendant WOODARD's actions affecting the care and custody of J.B. as well as the decision to attempt to coerce a safety plan.. He is sued in his individual capacity.

29. Defendant TIERNEY STUTZ is an Area Administrator for DCFS, who at all relevant times had supervisory responsibility as to Defendants LEONARDO and WOODARD. Upon information and belief, Defendant STUTZ reviewed and approved the attempted coercive safety plan. He is sued in his individual capacity.

30. Defendant MARC D. SMITH is the acting Director DCFS. He is sued in his official capacity for declaratory relief.

31. At all times relevant to this complaint, each Defendant acted under color of state law.

## IV. STATEMENT OF FACTS GIVING RISE TO PLAINTIFFS' CLAIMS:

### A. TIMELINE
#### 1. The Intentionally False Statements Giving Rise To DCFS Referral

32. EDWIN BUSH and Erika Bush were in the middle of a dissolution of marriage proceeding, which was initiated in February 2017. Erika Bush has a history of physical abuse to J.B., yet attempted to obtain almost all of the parenting time of J.B. and A.B.

33. On October 1, 2018, Erika Bush took J.B. to see Dr. Reginald Pacheco of Athans and Associates in Park Ridge, Illinois.

34. Dr. Pacheco was unilaterally selected by Erika Bush without the consent of the children's Guardian *ad Litem*, Steve Wasko, or the knowledge of EDWIN BUSH. This act was a violation of domestic relations law, as EDWIN and Erika Bush shared joint decision-making.

35. During this session with Dr. Pacheco, Erika Bush alleged that J.B. was choked sometime in early August somewhere in Wisconsin by EDWIN while on vacation. Dr. Pacheco then made a call to the DCFS hotline on October 1.

## 2. Defendant WOODARD's Investigation Of The False, Unfounded Accusation

36. On November 29, 2018, EDWIN was informed by Assistant Attorney General Michelle Camp of the Illinois Attorney General's Office that the DCFS investigation was unfounded.

37. On November 30, 2018, Defendant WOODARD testified in Court the investigation was unfounded.

38. On October 2, WOODARD went to J.B.'s school in Park Ridge, St. Paul of the Cross. WOODARD made this visit unannounced to either the school or any of J.B.'s guardians, including his Guardian *ad Litem*.

39. WOODARD asked Mrs. Bridget Fletcher, a first-year front office secretary, to speak to J.B. Dr. Erika Mickelburgh, the Principal of St. Paul of the Cross, was not in the office or informed of this request.

8

40. For fifteen minutes in the afternoon of October 2, Defendant WOODARD met alone with J.B. in Dr. Mickelburgh's empty office and interrogated J.B. WOODARD did not advise J.B. of his ability to request a neutral third-party to sit in on this interrogation, as is his right established by DCFS rules.

41. On October 3, Defendant WOODARD interviewed Erika Bush at her apartment in Park Ridge for approximately 50 minutes. Erika Bush repeated the same false choking allegation to WOODARD that she made to Dr. Pacheco on October 1. Erika Bush falsely claimed to WOODARD that J.B. made the allegation in Dr. Pacheco's office, when in fact Erika Bush made the allegation.

42. On the evening of October 3, Defendant WOODARD interviewed EDWIN at his apartment, with both children present. WOODARD stated she was investigating an alleged choking incident in Wisconsin.

43. EDWIN informed WOODARD that this was an intentionally false report by Erika Bush. EDWIN further informed WOODARD that K.K. and her two children were in the car at the time of the non-incident and eyewitnesses. K.K. is a special education teacher at a public school and a mandated DCFS reporter, and filed an affidavit that no abuse ever occurred.

44. At no point was EDWIN presented with a written CANTS-8 notice, informing him what he was being investigated for, as required by DCFS rules. Nor did WOODARD or LEONARDO complete a Child Endangerment Risk Assessment Protocol (CERAP).

45. EDWIN informed Defendant WOODARD that Erika Bush has a documented history of physical abuse to J.B. according to DCFS own written records and making false statements to authorities.

46. After this initial interview, WOODARD left EDWIN's apartment for approximately twenty minutes.

### 3. The Illegal Coercive Attempt At Imposing A Safety Plan

47. During this interval, WOODARD spoke to Defendant MARCO LEONARDO and obtained his to permission to summon the Cook County Sheriff's Office (CCSO) to attempt to coerce a safety plan. Soon later, two CCSO police officers arrived at EDWIN's residence wearing body cameras, which captured the audio and video of this entire incident.

48. When the CCSO police arrived, Officer Williams asked Defendant WOODARD if they were there to remove children. WOODARD lied to them and said "no," when WOODARD had already contacted Erika Bush to come to EDWIN's apartment and take possession of the children.

49. WOODARD stated she was there to just "establish a plan." WOODARD further lied to the police by omission when she refused to answer Officer Reillo's question if they had jurisdiction. WOODARD knew this alleged incident occurred somewhere in Wisconsin months prior.

50. Shocked at their arrival, EDWIN attempted to inform WOODARD and the police that Erika Bush has a documented history of physical abuse to J.B. according to DCFS records. WOODARD refused to listen, focused only on attempting to coerce a safety plan with two officers present.

10

51. EDWIN then proceeded to demonstrate on J.B. that there was no abuse in front of CCSO police and WOODARD.

52. A few minutes later, J.B. exclaimed "my dad did not choke me" unprompted, and recorded on video.

53. Due to J.B. being frightened, DCFS investigating a false, malicious allegation and an attempted violation of EDWIN, J.B. and A.B.'s due process rights and DCFS rules, EDWIN ordered WOODARD and the two CCSO officers out of his apartment. EDWIN is a licensed attorney in Illinois.

54. Defendant WOODARD refused to leave twice after EDWIN ordered her out, committing trespass.

55. EDWIN proceeded to escalate his demands until WOODARD, Officer Reillo and Williams finally left, ordering them out a total of 12 times.

56. Upon leaving EDWIN's apartment, WOODARD telephoned her supervisor Defendant MARCO LEONARDO. In a conversation recorded on video, WOODARD stated: "I am not trying to PC [meaning protective custody] this child, I am not, I was just trying to have a care plan with him."

57. WOODARD stated that EDWIN had parenting rights that night according to a court order. She further stated that Erika Bush "mother" was already trying to reduce EDWIN's parenting time with J.B. and A.B., which is an obvious motive to make a false complaint.

58. After Defendant WOODARD hung up with Defendant MARCO LEONARDO, Officer Williams told WOODARD: "He (EDWIN) had that right to throw us out from his house."

59. WOODARD then went outside to await for Erika Bush's arrival at the apartment complex, although with no children to exchange.

60. WOODARD then called the CCSO again to conduct a "wellbeing check." A third CCSO officer arrived at EDWIN's residence on October 3, stated the children were "fine" and left a few minutes later.

61. On October 19, 2018, EDWIN telephoned Defendant MARCO LEONARDO because he had not yet received the CANTS-8 notice, which is supposed to describe the allegation in writing and be tendered upon the initial interview.

62. Later on October 19, a DCFS secretary e-mailed EDWIN the CANTS-8 notice. The CANTS-8 notice stated DCFS was investigating an incident at an address in Bartlett, Illinois, when Plaintiffs have never been to Bartlett, Illinois.

### 4. Defendant WOODARD's E-mail To Erika Bush's Counsel Recommending Supervised Visitation

63. In retaliation for EDWIN refusing to agree to an unconstitutionally coercive safety plan, Defendant wrote to Erika Bush's divorce counsel Mammas & Goldberg, LLC on October 5, 2018 at 8:45 p.m. WOODARD stated: "I informed the GAL Steve Wasco (sic) of the recommendation that Edwin Bush have supervised visitation with child…until Mr. Edwin Bush undergoes a mental health/psychological assessment."

64. WOODARD did not know that EDWIN already took the Domestic Violence Inventory (DVI) examination in July 2017 as part of a custody evaluation.

65. WOODARD did not know that EDWIN scored 24 points lower than Erika Bush on risk of violence, and scored a low risk for losing control, while testing extremely truthful.

**5. The Substantive Due Process Violations in the Domestic Relations Court**

66. On October 10, November 6 and November 30, 2018, as well as January 10, January 24, May 2 and June 10, Judge Carr stated explicitly he was holding Plaintiff's lawful ejection of WOODARD as the basis to deprive Plaintiff and the children of their fundamental due process rights.

67. An August 16 status date had passed where Erika Bush appeared in Court and presented nothing about any allegations of abuse, nor stated anything to the Guardian *ad Litem*.

68. On October 9, 2018, Erika Bush filed an Emergency Petition For Emergency Order of Protection in Cook County Domestic Relations Court before Judge John T Carr. Concurrently, Erika Bush filed an emergency motion for supervised parenting time, and included Defendant WOODARD's October 5 e-mail as an exhibit.

69. This petition and motion were false, as they falsely claimed J.B. made the allegation in Dr. Pacheco's office on October 1, when in fact it was Erika Bush.

70. On October 10, while admittingly not reading Plaintiff's responsive pleadings, Judge Carr found abuse and granted the Emergency Petition for Emergency Order of Protection for an alleged non-incident that occurred on August 3, 2018.

71. During this hearing, Erika Bush committed perjury and claimed that J.B. made the allegation in Dr. Pacheco's office on October 1, when in fact it was Erika Bush.

72. EDWIN did not have an opportunity to cross-examine Defendant WOODARD, despite Judge Carr reading her hearsay October 5 e-mail to Mammas & Goldberg.

73. On November 6, 2018, during a hearing on Plaintiff's Motion For Reconsideration of the Emergency Order of Protection, Judge John T. Carr completely discarded

13

Plaintiff's arguments that DCFS was in the act of breaking the *A.B. v. Holliman* agreement and Policy Guide 2016.10 on October 3 when he ejected them.

74. On November 30, 2018, Erika Bush's petition for a plenary order of protection was denied by Judge John Carr.

75. On November 30, 2018, WOODARD stated she had been an investigator at DCFS since March, 2018.

76. On November 30, 2018, WOODARD testified to violating Policy Guide 2016.10 by attempting to illegally coerce a safety plan.

77. On November 30, 2018, WOODARD further testified as to still not knowing the date, place and time of the allegation of abuse.

78. On November 30, 2018, WOODARD defined a "care plan" as the same definition as a "safety plan" in DCFS rules.

79. On November 30, 2018, Judge John T. Carr sustained an objection as to relevance to Plaintiff's evidence and argument that DCFS violated the law and DCFS procedures. Judge Carr stated: "…you can question her as to what was done in this, not as to what the regulations are, because so far, you know, she's testified to what was done. That's what I want to hear…So if you're telling me that she violated the rules of DCFS, go to DCFS and tell them."

80. On November 30, 2018, Judge Carr *sua sponte* suspended EDWIN's parenting time indefinitely under 750 ILCS 5/603.10, after cutting the proceeding short and informing EDWIN he was denying the plenary order of protection. His basis was EDWIN's ejection of WOODARD.

14

81. There was no motion or pleading to suspend EDWIN's parenting time, making the November 30, 2018 Order void *ab initio* under *O'Halleran v. Harder*, 2016 ILL App. 151990, pars. 33-36.

82. In a written June 5, 2019 opinion, Judge Timothy Murphy stated there was no notice or pleading to suspend parenting time on November 30, 2018.

83. On June 10 and June 14, 2019, Judge John T. Carr was confronted with these errors and he refused to motion to declare the November 30, 2018 order void, to reinstate parenting time or to appoint an expert to examine J.B. and A.B. for the fourth time.

### 6. Judge Carr Conditioned Reinstatement Of Parenting Time That Was Impossible Under 750 ILCS 5/607.6(d)

84. On November 30, 2018, Judge Carr further ordered EDWIN's parenting time would be suspended until he completed the open-ended anger management counseling and the Court is "satisfied."

85. In the November 30 Court transcript, Judge Carr stated when the counselor believed visitation is in the children's best interest, parenting time would be reinstated.

86. On December 20, 2018, Dr. John Palen was appointed to conduct the anger management counseling, and EDWIN was granted time on December 21, 2018 to visit with J.B. in Dr. Palen's office.

87. On December 21, 2018, in a conversation that was recorded by EDWIN, J.B. stated in Dr. Palen's office he could not remember the alleged non-incident from August 3, 2018 when asked repeatedly. J.B. had no idea why he could not see his father, said he and A.B. were crying repeatedly, said he was not scared of his father, was never harmed by his father, wanted to spend time with his father, and wanted to

speak to Judge Carr and WOODARD to end the separation, which was clearly intent of waiver. J.B. stated in fact Erika Bush had repeatedly slapped him in the face and pulled his hair, which is what EDWIN witnessed as well.

88. As a result of 750 ILCS 5/607.6(d), Dr. John Palen is prevented from discussing the counseling session with J.B. and EDWIN that included J.B.'s exculpatory and heart-wrenching statements, both with the Guardian *ad Litem* and the domestic relations court.

89. In addition, Dr. Palen is ethically conflicted from giving an opinion about J.B.'s best interest because it was derived from confidential conversations and Dr. Palen is EDWIN's counselor. Custody evaluators can give opinions as to the child's best interest, but Dr. Palen was conflicted as he was EDWIN's counselor.

90. Judge John Carr repeatedly refused to appoint an expert to examine J.B. or A.B. on motion by EDWIN, and the Guardian *ad Litem* Steve Wasko was totally uninvolved in this case and refused to return phone calls and e-mails from Dr. Palen.

91. On November 30, 2018, Judge John T. Carr illegally suspended EDWIN's parenting time on a void order and ordered conditions to reinstate parenting time that were legally and practically impossible to comply with.

92. J.B., A.B. and EDWIN have not had parenting time since October 3, 2018.

93. On December 19, 2018, Dr. Palen described the lack of parenting time as a "crisis."

94. On June 10, 2019, Dr. Palen stated: "As a child therapist, I am gravely concerned about the emotional welfare of these two young children. They are at serious risk of experiencing life-long struggles with attachment the longer this situation

continues…as time has evolved it seems that the children have almost become an after-thought in the eyes of the Court."

95. 750 ILCS 5/607.6(d) is so overbroad, school systems believe this statute applies to at-risk students, and it is preventing teachers and special education specialists from providing wholistic care as counseling sessions amount to a "black hole."

### 7. Violations Of Constitutional Rights In Domestic Relations Courts Is A Widespread Practice, and Public Policy States Children Should Not Be Removed From Non-Offending Parents

96. On February 14, 2019, Dr. James Bedell of Cary, Illinois testified before the Family Law Subcommittee of the Illinois General Assembly on House Bill 185, on behalf of Illinois Fathers For Equality (ILFFE). Dr. Bedell, who has extensive experience in Cook and suburban counties conducting custody evaluations and is intimately familiar with Illinois Domestic Relations Courts, testified that in practice: "There is no more unprotected place than for individuals to go than to walk into the family court because each individual parent is not protected by our constitutional fundamental right." Dr. Bedell further stated the victims are predominantly men.

97. On May 22, 2019, Judge Timothy Murphy stated from the bench that nobody is supervising DCFS, which has had 15 directors in 16 years. Judge Murphy said the failure of supervision is both internal within DCFS, and also within the domestic relations courts, as DCFS routinely avoids lawful subpoenas.

98. The treatment of domestic violence victims by the child welfare system has been roundly criticized by many social scientists, advocates for victims, and legal authorities, including judges. *See* Susan Schechter & Jeffrey L. Edleson, Effective Interventions in Domestic Violence and Child Maltreatment Cases: Guidelines for

17

Policy and Practice (National Council of Juvenile and Family Court Judges, 1998), available for download at https://rcdvcpc.org/thegreenbook.html (commonly referred to as "The Greenbook"). *See also Nicholson v. Scoppetta*, 344 F.3d 154 (2nd Cir. 2003).

99. It is contrary to public policy to remove children from their non-offending parents based on the conduct of the domestic violence perpetrator. Experts note that to "ensure stability and permanency for children, child welfare administrators and juvenile court personnel should try to keep children affected by maltreatment and domestic violence in the care of their non-offending parent (or parents), whenever possible." Schechter & Edleson, *supra*, at 72.

**B. THE ILLINOIS LEGAL FRAMEWORK GOVERNING THE INVOLUNTARY REMOVAL OF ABUSED OR NEGLECTED CHILDREN FROM THEIR PARENTS**
   **1. Legal Requirements as to Involuntary Removal of Children from Their Parents' Custody**

100. Pursuant to the Illinois Abused and Neglected Child Reporting Act ("ANCRA"), DCFS receives reports, via calls to the Illinois State Central Register (known as the "Child Abuse Hotline" or "Hotline" or "SCR") from persons who have "reasonable cause to believe a child may be an abused child or a neglected child." 325 ILCS 5/4. DCFS must promptly investigate the reports, *id.* at 5/7, working jointly with law enforcement authorities if the allegations give rise to a potential criminal complaint. *Id.* at 5/7.3.

101. Under Illinois law, only police officers, doctors, and DCFS investigative employees have authority to remove children involuntarily from their parents. 325 ILCS 5/5. This authority under Illinois law exists only if "there is not time to apply for a court order,"

and leaving the child in the custody of his or her parent(s) would "endanger the child's health or safety." *Id.*

102.   As a constitutional matter, to remove children from their parents involuntarily, a state actor must have probable cause to believe that the children have been abused or neglected by the parents. Absent exigent circumstances or a court order, a DCFS investigator may not take children from their parents without the voluntary consent of the parents. *Hernandez v. Foster*, 657 F.3d 463 (7th Cir. 2014).

103.   DCFS policies require that a DCFS supervisor and child protection manager or area administrator approve any removal of children from parents pursuant to a Hotline call investigation.

104.   Children whom DCFS has removed involuntarily from parents must be brought before judicial officers within 48 hours, exclusive of holidays and weekends. 705 ILCS 405/2- 9. If a judicial officer does not approve the continued detention of a child, or if the child is not brought before a judicial officer within the 48-hour period, DCFS must release the child. *Id.* DCFS is not allowed to wait for the 48-hour period to elapse if, during the 48 hour period, DCFS staff learn that there is not probable cause to continue to detain the child. *Hernandez, supra*.

105.   Nothing in Illinois law permits a DCFS employee to coerce a parent's signature or to orally direct a so-called safety plan.

106.   In order to continue detaining children away from their parents, DCFS must file a petition against the parents and appear before a judge. At a temporary custody hearing which must be held within 48 hours of the detention of children away from their

parents without parental consent, the juvenile court must find there is "immediate and urgent necessity" to keep the children from the parents. 705 ILCS 405/2-10.

107.  Illinois law does not authorize DCFS employees to issue oral directives to families concerning their family lives. If DCFS determines that parents should live under restrictions (such as having "no unsupervised contact" with their children), DCFS must file a petition with a juvenile court, requesting the court to order such restrictions.

108.  To make appropriate orders including restrictions on contact between parents and their children pursuant to the Illinois Juvenile Court Act, the juvenile court first must find there is probable cause to believe that the children are abused or neglected, 705 ILCS 405/2-10 (requiring dismissal of petitions as to which there is no probable cause). Then, under appropriate circumstances and with an evidentiary showing to support such relief, the juvenile court is authorized to enter orders of protection requiring families to abide by restrictive conditions on their family life. 705 ILCS 405/2-25.

### 2. Investigations of Hotline Calls and Safety Plan Policies

109.  Hotline calls may be screened out from being investigated by DCFS if they do not fit within the Illinois "allegation system." Upon receipt of Hotline calls at the State Central Register, calls are coded according to allegations set forth in definitions in rules promulgated under the Administrative Procedure Act.

110.  Upon receipt of a Hotline call, DCFS investigators who are assigned to investigate the call have 24 hours in which to respond with a good faith attempt to see the children. 89 ILL. ADMIN. CODE tit. 89, § 300.10(c) (2017).

111. Within 24 hours thereafter, the assigned investigator is expected to complete a so-called Child Endangerment Risk Assessment Protocol (CERAP), which is a protocol that is mandated under Illinois law for the immediate safety assessment of children who are the subject of Hotline calls. All DCFS investigators and intact services workers are required to pass CERAP certification.

112. Pursuant to CERAP, DCFS assesses a variety of factors that it deems to be safety threats. But it is not necessary to have evidence in support of any factor to complete the CERAP form.

113. If safety threats are deemed to be unmitigated, under a process that also does not require any evidence, then DCFS policies, practices, customs, and usages dictate, except as modified by the *A.B. v. Holliman* agreements described herein (§ C below), that a safety plan is necessary, including an "out-of-home" safety plan under which children are required to reside with someone other than their parent.

114. Under practices challenged herein and in the *A.B. v. Holliman* suit, described in § C below, in implementing CERAP, DCFS customarily demands safety plans without regard to whether it possesses probable cause to believe a child was abused or neglected by the parent from whom the child is removed, and without exigent circumstances that would justify the separation of children from their parents without a court order.

115. Independently of the results of CERAP, DCFS investigators are responsible to determine the outcome of the investigation assigned to them. They are responsible to investigate the merits of specific allegations that have definitions set forth in DCFS Rules, 89 ILL. ADMIN. CODE tit. 89, § 300, App'x B.

21

116. Each allegation of abuse or neglect is given an allegation number in the DCFS investigation system.

117. DCFS is required to complete investigations of Hotline calls that are accepted for investigation within 60 days, whether or not DCFS seeks any court orders regarding the children. DCFS investigators must determine if the allegations under investigation are "indicated" or "unfounded". 325 ILL. COMP. STAT. 5/7.12. In making the determination, DCFS investigators must consider all available evidence, including exculpatory evidence to the assessment of whether there is sufficient "credible" evidence to indicate an allegation.

118. DCFS must report its determination (of "indicated" or "unfounded") to the Illinois State Central Register forthwith. 325 ILL. COMP. STAT. 7/7, 7/12.

119. At the conclusion of the investigation, DCFS registers its findings as to whether the allegations are "indicated" or "unfounded," and as to which parent, if any, is determined to be a perpetrator, in the State Central Register. Notice to the target of the investigation ordinarily is issued within a few weeks.

120. Persons who are indicated as perpetrators of child abuse or neglect have a right to appeal.

## C. THE *A.B. V. HOLLIMAN* FEDERAL SETTLEMENT AGREEMENT AND CONSTITUTIONAL REMEDIATIONS DCFS WERE ORDERED TO ENACT INVOLVING SAFETY PLANS

121. *A.B. v. Holliman* was a 3-count complaint filed in 2014 that alleged procedural and substantive due process violations as a result of DCFS coercively imposing safety plans without cause. Magistrate Judge Sidney Shenkier presided over the case. DCFS settled this case with approval by the federal court on June 23, 2016 and were required

to attach the Safety Plan Rights and Responsibilities forms used by staff to the federal settlement. The settlement of the *A.B.* suit is attached as Exhibit B to this complaint.

122. On August 25, 2016, DCFS Director George H. Sheldon issued a memo to all Child Protection and DCFS/POS Child Welfare Staff and Supervisors called Policy Guide 2016.10, attached hereto as Exhibit C, and appended it into Procedures 300 Appendix G. Pursuant to the settlement agreement, DCFS was required to amend Procedures 300 Appendix G, as well as forms CFS 1441-D, 1441-E and 1441-F to state the rights and procedures of parents.

123. The purpose of Policy Guide 2016.10 "is to provide Child Protection and Child Welfare staff with revised and updated Safety Plan Rights and Responsibilities for Parents and Guardians, Safety Plan Rights and Responsibilities for Adult Caregivers and Safety Plan Participants and Safety Plan Rights and Responsibilities for Investigators and Caseworkers."

124. Policy Guide 2016.10 defines safety plans as "voluntary, temporary and short term measures designed to control serious and immediate threats to children's safety."

125. Policy Guide 2016.10 states "safety plans must be adequate to ensure the child's safety and to be as **minimally disruptive** to the child and family as is reasonably possible. Additionally, families can request that a safety plan be modified or terminated at any time. The safety plan will indicate which safety threat or threats have led to the need for a safety plan according to the completion of the CERAP (Child Endangerment Risk Assessment Protocol). The safety plan will require a written description of what will be done or what actions will be taken to protect children, who will be responsible for implementing the components of the safety plan

23

and how/who will monitor it. It is important that safety plans be developed with the family to control specific threats and that the family understands the mechanism for ending each safety plan. **Under no circumstance is a safety plan to serve as the solution to a long-term problem. A family may request at any time to modify or terminate the safety plan.**"

126. Policy Guide 2016.10 continues: "When a safety plan is implemented, it should be documented on a CFS 1441-A, Safety Plan when it is likely that a child could be moderately or severely harmed now or in the very near future. The safety plan must be developed whenever there are protective efforts that would reasonably ensure child safety and permit the child to remain in their caregiver's custody. After the safety plan has been developed, it must be immediately implemented to ensure that all of the designated tasks are completed effectively. The safety plan should contain timeframes for implementation and continued monitoring."

127. Illinois Public Act 98-0830 amended Section 21 (f) of the Children and Family Services Act [20 ILCS 505/21] and required the Department or POS caseworker to provide information to each parent, guardian and adult caregiver participating in a safety plan explaining their rights and responsibilities. Policy Guide 2016.10 updated the forms to add additional information to the Safety Plan Rights and Responsibilities forms with the following information:

> • The investigator and caseworker shall implement a safety plan only when DCFS has a basis to take protective custody of a child(ren) and the safety plan is an alternative to protective custody; (emphasis added).

- The investigator and caseworker shall explain to the parent(s)/guardian(s) the safety plan alternatives and that the parent(s)/guardian(s) have a voluntary choice to enter into the safety plan as an alternative to protective custody and to choose the individual(s) responsible for supervising or monitoring the safety plan if such person(s) is/are determined to be qualified by DCFS;

- The investigator and caseworker shall modify the safety plan if the family's circumstances change or if the participants request modifications, including a change in the person(s) preferred by the parent(s)/guardian(s) to supervise or monitor the safety plan or serve as a temporary caregiver;

- Terminate the safety plan as soon as the investigator and/or supervisor determine there is no longer a legal basis to take protective custody and provide the parent(s)/guardian(s) with the Safety Plan Termination form; and

- The Department or POS representative shall ensure that the safety plan is reviewed and approved by their respective supervisor.

128. Policy Guide 2016.10 required Child Protection and Child Welfare staff to provide parents participating in a safety plan with a copy of the CFS 1441-A, Safety Plan that has been signed by all adult participants and the DCFS/POS representative. After receiving verbal supervisory approval of the safety plan prior to leaving the family home, the Department or POS representative shall submit the signed CFS 1441-A to their respective supervisor for review and approval.

129. CFS 1441-D, titled "Safety Plan Rights and Responsibilities For Parents and Guardians," attached hereto as Exhibit D, states parents have the right, among others, to:

- Only be asked to agree to a safety plan if there has been a determination by DCFS, approved by a DCFS supervisor, that DCFS possesses legally sufficient grounds for protective custody; (emphasis added)

- Be informed in writing of the basis for the DCFS determination that there is an immediate and imminent threat of moderate to severe harm to your child(ren) as set forth in the safety plan;

- Refuse to enter into a safety plan arrangement for your child(ren), understanding that DCFS will then assess whether protective custody is necessary to protect your child(ren) from immediate harm;

- Provide information to DCFS that relates to the basis for finding the presence of an immediate safety threat;

- Inform DCFS of circumstances that the parent(s) or caregiver(s) believe mitigates or reduces the identified safety threat;

## D. THE 7TH CIRCUIT HOLDS DEFENDANTS LIABLE UNDER 42 U.S.C. § 1983 FOR ACTIONS THAT SET IN MOTION THE VIOLATION OF CONSTITUTIONAL RIGHTS

130. "An official causes a constitutional violation if he or she sets in motion a series of events that they knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights. *Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir.1999). Therefore, "[a]n official satisfies the personal responsibility required of 42 U.S.C. §1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent."

*Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir.1985) (internal quotation omitted)."

*Quoting from Brokaw v. Mercer County*, 235 F.3d 1000, 1012 (7th Cir. 2000).

## V.    CLAIMS FOR RELIEF

### A. COUNT I: DECLARATORY AND INJUNCTIVE RELIEF THAT 750 ILCS 5/607.6(d) VIOLATES THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION, AMENDMENT XIV, AS WELL AS AMENDMENT I.

131.   Plaintiff incorporates paragraphs 1 through 130 as if fully set forth herein.

132.   Plaintiff brings this Count against Defendant MARC D. SMITH in his official capacity, who is represented by the Illinois Attorney General's office.

133.   The defendant sued in this count are sued for the actions of his agency taken under color of state law, which set in motion events that led to the violation of Plantiffs' constitutional rights and the problems of the overbroad 750 ILCS 5/607.6(d) statute. J.B.'s statements in Dr. Palen's office conflict with what WOODARD reported to the Guardian *ad Litem* and the domestic relations court.

134.   This count seeks emergency temporary, preliminary and a permanent declaratory judgment and injunctive relief that 750 ILCS 5/607.6(d) violates the Due Process Clause of the United States Constitution, Amendment XIV, as well as Amendment I and is unenforceable and void.

135.   750 ILCS 5/607.6(d) is an overbroad restriction of speech as it prevents Plaintiff and court-appointed experts from discussing counseling sessions with anybody, or introducing evidence into Illinois courts in any manner.

136.   This statute does not even contain provisions allowing for it to be waived.

137.   In this case, Plaintiff is prevented from presenting J.B.'s exculpatory statements into domestic relations court, which would satisfy the conditions to end the illegal

deprivation of their fundamental liberty interests in familial association, familial autonomy, familial integrity and family privacy. Moreover, it could factor into allocation of parenting time and responsibilities. In addition, Plaintiff is prevented from introducing J.B.'s inculpatory statements against Erika Bush that could lead to a finding of criminal contempt of court for committing perjury.

138. The injunctive and declaratory relief Plaintiff seeks against the continued separation of his children from his care and custody is authorized by 28 U.S.C. § 2201 and §2202 and Fed. R. Civ P. 65.

139. Pursuant to Fed. Civ. P. 65, Plaintiff states that:

    a. As a result of the unconstitutionally overbroad statute, he and the minor children are being irreparably injured and their substantive due process rights are being violated;

    b. Plaintiff is likely to prevail on the merits of his claim that 750 ILC 5/607.6(d) is unconstitutionally overbroad and violates his and the minor children's due process rights; and

    c. There is no adequate remedy at law.

140. As relief under this Count, Plaintiff seeks the following temporary, preliminary, and permanent injunctive relief:

    a. A temporary, preliminary and permanent injunction against enforcement of 750 ILCS 5/607.6(d), and that Plaintiff be entitled to present the statements of J.B. in the December 21, 2018 counseling session before any court.

141. As further relief under this Count, Plaintiff seeks a declaratory judgment in his favor by finding and declaring that his constitutional rights have been violated by operation of this statute.

### B. COUNT II: PLAINTIFFS J.B., A.B. AND EDWIN BUSH'S 42 U.S.C. § 1983 CLAIM FOR COMPENSATORY AND PUNITIVE DAMAGES FOR VIOLATION OF THE SUBSTANTIVE DUE PROCESS RIGHTS TO FAMILIAL ASSOCIATION

142. The Plaintiffs in Count II are infant plaintiffs J.B., A.B. and Plaintiff EDWIN BUSH.

143. Plaintiffs incorporate paragraphs 1 through 130 as if fully set forth herein.

144. In this Count, plaintiffs sue Defendants MARC D. SMITH in his official capacity. Plaintiffs also sue Defendants WOODARD, LEONARDO AND STUTZ, in their individual capacities. Plaintiffs sue Defendants WOODARD, LEONARDO AND STUTZ in their individual capacities for compensatory and punitive damages.

145. All defendants are sued for their actions taken under color of state law.

146. The Count II Defendants, acting individually and in concern with one another, violated the constitutional rights of Plaintiff and infant plaintiffs to familial association, familial autonomy, familial integrity, and family privacy by attempting to illegally coercive a safety plan on October 3, 2018 with unwitting CCSO police. When attempting to seize infant plaintiffs from Plaintiff, Count II Defendants did not possess definite and articulable evidence giving rise to a reasonable suspicion that J.B. had been or would be abused or neglected by Plaintiff, and there were no exigent circumstances justifying such action absent a court order.

147.   When Plaintiff EDWIN BUSH refused, DCFS retaliated by sending an e-mail to opposing counsel supporting an effort to get supervised visitation in Cook County Domestic Relations Court, which is notorious for carelessness and routinely violating the Constitutional rights of parties, and who are not supervised by federal courts. DCFS intentionally did an "end around" Illinois law by not filing their claim in juvenile court pursuant to the directives of the Juvenile Court Act.  Due to the actions of DCFS violating procedural due process by violating Policy Guide 2016.10, DCFS caused the Plaintiff's substantive due process rights to be violated for over eight months by the Cook County Domestic Relations Court.

148.   Moreover, by causing the restriction of Plaintiff's parental rights to care, custody and control with infant plaintiffs by attempting a safety plan with admittedly no cause to take protective custody in a case that was ultimately unfounded, the Count II Defendants, acting individually and in concert with one another, violated Plaintiffs J.B., A.B. and EDWIN BUSH's substantive due process rights to familial association, familial autonomy, familial integrity and family privacy.

149.   From October 1, 2018 to the present time, Defendant MARC D. SMITH maintained practices that permitted or authorized the individual defendants' actions or failed to adopt reasonable policies and practices that reasonably would have prevented the violation of plaintiffs' rights.

150.   The specific dates on which each Defendant sued in their individual capacities had direct responsibility for causing the violation of the rights of the plaintiffs in the manner set fort in paragraphs as incorporated herein, are as follows:

a. From October 1, 2018 to the present, Defendant WOODARD intentionally, maliciously, recklessly and/or with deliberate indifference attempted to coerce a safety plan with the assistance of the CCSO police, after lying to them she had no intentions to remove the children and whether the police had jurisdiction. WOODARD never conducted a CERAP (Child Endangerment Risk Assessment Protocol) or even tendered a CANTS-8 notice. WOODARD stated on video: "I am not trying to PC this child, I am not, I was just trying to have a care plan with him" when Policy Guide 2016.10 and CFS 1441-D state: "The investigator and caseworker shall implement a safety plan only when DCFS has a basis to take protective custody of a child(ren) and the safety plan is an alternative to protective custody." WOODARD then skirted the procedural requirements of the Juvenile Court Act by writing an e-mail to Mammas & Goldberg recommending supervised visitation in an ongoing divorce case, and which e-mail was included in court pleadings and read by Judge Carr. WOODARD had a lengthy phone discussion with the Guardian *ad Litem*, who then reported her hearsay statements to the Court on October 10, 2018. On November 30, 2018, WOODARD testified in Court and made false and disparaging remarks regarding EDWIN. On seven different occasions, Judge Carr stated EDWIN was denied parenting time entirely because he invoked his constitutional right to eject WOODARD and the CCSO officers from his apartment, when they had no legal predicate to even enter his apartment.

31

b. From October 1, 2018 to the present, Defendant LEONARDO intentionally, maliciously, recklessly and/or with deliberate indifference approved WOODARD calling the CCSO police to attempt to coerce a safety plan without a basis to take protective custody of the children, or conducting a CERAP or tendering a CANTS-8 notice. LEONARDO further supervised WOODARD as she wrote an e-mail to opposing counsel in an ongoing divorce case, skirting the requirements of the Juvenile Court Act, and had conversations with the Guardian *ad Litem,* who then reported her hearsay statements to the Court on October 10, 2018. On seven different occasions, Judge Carr stated EDWIN BUSH was denied parenting time entirely because he invoked his Constitutional rights to eject WOODARD and the CCSO officers from his apartment, when they had no legal predicate to enter his apartment.

c. From October 1, 2018 to the present, Defendant STUTZ supervised WOODARD and LEONARDO as they violated the *A.B. v. Holliman* federal consent decree and Policy Guide 2016.10 intentionally, maliciously, recklessly and/or with deliberate indifference to Plaintiffs, never conducting a CERAP. STUTZ further supervised WOODARD and LEONARDO as WOODARD wrote an e-mail to opposing counsel in an ongoing divorce case, skirting the requirements of the Juvenile Court Act, and had conversations with the Guardian *ad Litem,* who then reported her hearsay statements to the Court on October 10, 2018. On seven different occasions, Judge Carr stated EDWIN BUSH was denied parenting time entirely because he invoked his

Constitutional rights to eject WOODARD and the CCSO officers from his apartment, when they had no legal predicate to enter his apartment.

151. The actions and conduct of the Count II Defendants caused injury to each of the plaintiffs.

152. As relief, plaintiffs demand: (a) a declaratory judgment against Defendant MARC D. SMITH against the policies and practices of DCFS whose application to plaintiffs deprived them of substantive due process; (b) a declaratory judgment that each of the defendants WOODARD, LEONARDO AND STUTZ in their individual capacities violated plaintiffs' rights to substantive due process; (c) compensatory damages against the Count I Defendants in an amount not less than $550,000 for each Plaintiff; (d) punitive damages against Defendants WOODARD, LEONARDO AND STUTZ; and (e) reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and any other relief, including, but not limited to, an award of costs, as this Court deems appropriate.

153. Each defendant sued in their individual capacity acted intentionally, recklessly and/or with deliberate indifference and/or in accordance with policies and practices of which they had been directed to follow, without regard to the legality of such policies and practices to the consequences of their actions as set forth above.

## C. COUNT III: PLAINTIFFS J.B., A.B. AND EDWIN BUSH'S 42 U.S.C. § CLAIM FOR VIOLATION OF PLAINTIFFS' RIGHT TO PROCEDURAL DUE PROCESS

154. Plaintiffs in Count III are infant plaintiffs J.B., A.B. and Plaintiff EDWIN BUSH.

155. Plaintiffs J.B., A.B. and EDWIN BUSH incorporate paragraphs 1-130 as if fully set forth herein.

156. In this Count III, plaintiffs sue Defendant MARC D. SMITH in his official capacity for declaratory relief against the practices of the DCFS defendants whose application to plaintiffs deprived them of procedural due process. They further seek a declaratory judgment that each of the Defendants WOODARD, LEONARDO and STUTZ violated plaintiffs' rights to procedural due process. Plaintiffs sue Defendants WOODARD, LEONARDO and STUTZ in their individual capacities for compensatory relief and punitive damages.

157. All defendants are sued for their actions taken under color of state law.

158. The specific dates on which each Defendant sued in their individual capacities had direct responsibility for causing the violation of the rights of the plaintiffs in the manner set fort in paragraphs as incorporated herein, are as follows:

    a. From October 1, 2018 to the present, Defendant WOODARD intentionally, maliciously, recklessly and/or with deliberate indifference attempted to coerce a safety plan with the assistance of the CCSO police, after lying to them she had no intentions to remove the children and that the police had jurisdiction. WOODARD never conducted a CERAP (Child Endangerment Risk Assessment Protocol) or even tendered a CANTS-8 notice. WOODARD stated on video: "I am not trying to PC this child, I am not, I was just trying to have a care plan with him" when Policy Guide 2016.10 and CFS 1441-D state: "The investigator and caseworker shall implement a safety plan only when DCFS has a basis to take protective custody of a child(ren) and the safety plan is an alternative to protective custody." WOODARD then skirted the procedural requirements of the Juvenile Court Act by writing an e-mail to

Mammas & Goldberg recommending supervised visitation in an ongoing divorce case, and which e-mail was included in court pleadings and read by Judge Carr. WOODARD had a lengthy phone discussion with the Guardian *ad Litem*, who then reported her hearsay statements to the Court on October 10, 2018. On November 30, 2018, WOODARD testified in Court and made false and disparaging remarks regarding EDWIN. On seven different occasions, Judge Carr stated EDWIN was denied parenting time entirely because he invoked his constitutional right to eject WOODARD and the CCSO officers from his apartment, when they had no legal predicate to even enter his apartment.

b. From October 1, 2018 to the present, Defendant LEONARDO intentionally, maliciously, recklessly and/or with deliberate indifference approved WOODARD calling the CCSO police to attempt to coerce a safety plan without a basis to take protective custody of the children, or conducting a CERAP or tendering a CANTS-8 notice. LEONARDO further supervised WOODARD as she wrote an e-mail to opposing counsel in an ongoing divorce case, skirting the requirements of the Juvenile Court Act, and had conversations with the Guardian *ad Litem,* who then reported her hearsay statements to the Court on October 10, 2018. On seven different occasions, Judge Carr stated EDWIN BUSH was denied parenting time entirely because he invoked his Constitutional rights to eject WOODARD and the CCSO officers from his apartment, when they had no legal predicate to enter his apartment.

35

c. From October 1, 2018 to the present, Defendant STUTZ supervised WOODARD and LEONARDO as they violated the *A.B. v. Holliman* federal consent decree and Policy Guide 2016.10 intentionally, maliciously, recklessly and/or with deliberate indifference to Plaintiffs, never conducting a CERAP. STUTZ further supervised WOODARD and LEONARDO as WOODARD wrote an e-mail to opposing counsel in an ongoing divorce case, skirting the requirements of the Juvenile Court Act, and had conversations with the Guardian *ad Litem,* who then reported her hearsay statements to the Court on October 10, 2018. On seven different occasions, Judge Carr stated EDWIN BUSH was denied parenting time entirely because he invoked his Constitutional rights to eject WOODARD and the CCSO officers from his apartment, when they had no legal predicate to enter his apartment.

159. The actions and conduct of the Count III Defendants caused injury to each infant plaintiff and Plaintiff.

160. As relief, plaintiffs seek (a) a declaratory judgment against each of the Count III Defendants' actions which violated their rights to procedural due process; (b) compensatory damages in an amount of at least $550,000 for each Plaintiff against the Count III Defendants; and (c) reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and any other relief including, but not limited to, an award of costs as the Court deems appropriate.

161. Given that the Count III Defendants acted intentionally, recklessly and/or with deliberate indifference to the consequences of their actions as set forth above,

plaintiffs seek an award of punitive damages against the Count III Defendants WOODARD, LEONARDO and STUTZ.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs J.B., A.B. and EDWIN BUSH respectfully request that this Court enter the following judgments and awards on behalf of plaintiffs:

    (a) A declaratory judgment in their favor on all counts;

    (b) Compensatory damages, exclusive of costs and interest, against Defendants WOODARD, LEONARDO and STUTZ to which Plaintiffs are found to be entitled as set forth above;

    (c) Punitive damages against Defendants WOODARD, LEONARDO and STUTZ, exclusive of costs and interest, to which Plaintiffs are found to be entitled;

    (d) An award of interest, costs, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920 and 29 U.S.C. § 794(a); and

    (e) Such other relief as this Court deems just and equitable.

Dated:  June 18, 2019

RESPECTFULLY SUBMITED:

EDWIN F. BUSH

Edwin F. Bush III. - No. 61448
Attorney at law
8974 N. Western Avenue Suite #114
Des Plaines, IL 60016
(202) 487-8238

# EXHIBIT A

FILED
6/11/2019 11:52 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

2017D230075

5380735

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION, DISTRICT

| | |
|---|---|
| ERIKA BUSH | Case No.: Number |
| Petitioner, | |
| vs. | 2017 D 230075 |
| EDWIN F. BUSH, | |
| Respondent | |

TRANSCRIPT of video recording "Assist Other Agency" from the Cook County

Sheriff's Office produced via a Freedom of Information Act (FOIA) Request. Recording is 11

minutes and 25 seconds, recorded by the body camera of Officer Williams on the 3rd day of

October, A.D., 2018 at the hour of approximately 8:00 P.M.

2017 D 230075 - 1

FILED DATE: 6/11/2019 11:52 PM  2017D230075

P A R T I C I P A N T S:

    MR. EDWIN F. BUSH
    8974 N. Western, Suite 114
    Des Plaines, Illinois 60016

    JULIAN BUSH
    Minor child, D.O.B. 07/02/2011

    TIFFANY WOODARD
    Caseworker
    Department of Children and Family Services (DCFS)

    OFFICER CARMELO REILLO
    Police Officer
    Cook County Sheriff's Office Police

    OFFICER WILLIAMS
    Police Officer
    Cook County Sheriff's Office Police

2017 D 230075 - 2

1  0:00:30 [WOODARD, OFFICERS REILLO AND WILLIAMS outside 8974 N.

2  Western]

3  WOODARD: And my supervisor definitely told me to call, cause at first I was like oh you know

4  I think we can maybe work, I don't think that is going to work because he has been combative

5  the whole time, he's been super aggressive I don't know.  And then when I spoke to him about

6  the kids.

7  OFFICER WILLIAMS: On the phone or today?

8  WOODARD: About grabbing, in person, yes in person, I am talking in person, about grabbing

9  the child's neck.  He's like "you don't know what you're talking about."  It's, it's too much.

10  OFFICER WILLIAMS: OK

11  WOODARD:  You know what I mean?

12  OFFICER WILLIAMS: So are we removing kids this evening?

13  WOODARD:  No, we're not removing kids cause mom is here.

14  OFFICER WILLIAMS: OK

15  OFFICER REILLO:  We're just establishing a plan.

16  WOODARD:  We're just establishing a plan.  I just, in case this goes south, you know what I am

17  saying?  Cause it may go south.  So, just saying.  I am just letting you know.  Alright?

18  01:12 [WOODARD, OFFICERS REILLO AND WILLIAMS entering 8974 N. Western]

19  OFFICER REILLO:  The reports were done already that it said the back of the neck and all that.

20  WOODARD:  That's why I am here.

21  OFFICER REILLO:  OK

22  WOODARD:  He's convinced

23  OFFICER REILLO:  Did that occur here?

24  WOODARD:  [no answer to his question].  He's convinced that it was, he's convinced it was

25  mom that reported it.  Mom did not report this.  Mom didn't report it, I can't.  I am just tired.  At

26  this point I just want to establish a care plan, I want to do a safety plan.  Yes

27  [phone rings on intercom]

28  Hey yes, I am outside.  We, yes.

2017 D 230075 - 3

FILED DATE: 6/11/2019 11:52 PM  2017D230075

1  OFFICER WILLIAMS: Who was that just now on the phone?

2  WOODARD: That's him. Just letting him know I am coming. OK.

3  OFFICER WILLIAMS: Hey, how are you doing.

4  BUSH: What's up. [Lets them into the building]

5  OFFICER WILLIAMS: Hey, how's it going.

6      2:10 [WOODARD, OFFICERS REILLO AND WILLIAMS walk into apartment #114]

7  WOODARD: OK, so here is the situation.

8  BUSH: I am going to turn on the fan.

9  WOODARD: No it is fine. Here is the situation. The child. Since you told me that you

10  grabbed the child by its neck, I spoke to my supervisor.

11  BUSH: No, no, no, no, no, no, no.

12  OFFICER WILLIAMS: Hold on, hold on, hold on, let her talk.

13  OFFICER REILLO: Hear her out. Hear her out.

14  OFFICER WILLIAMS: Let her talk.

15  OFFICER REILLO: Let her speak.

16  BUSH: No, no, no, no, no, no, no.

17  OFFICER WILLIAMS: [raised voice] OK, I just said, wait, let her talk and then you'll have

18  your turn. Ok, do you understand that?

19  OFFICER REILLO: Just let her talk.

20  OFFICER WILLIAMS: Do you understand that? Yes you're being recorded, audio and video.

21  BUSH: Good.

22  OFFICER WILLIAMS: Do you understand that? Let her talk and then it's your turn. What's

23  your name? What's your name?

24  BUSH: I, honestly, you guys are beyond me. OK, go ahead and talk.

25  WOODARD: OK, so since that was something that you verbalized, not only did you verbalize

26  but you actually showed me that you grabbed him by the back of the neck.

27  BUSH: I didn't harm him at all.

28

2017 D 230075 - 4

FILED DATE: 6/11/2019 11:52 PM   2017D230075

FILED DATE: 6/11/2019 11:52 PM    2017D230075

1      [J.B. starts speaking in the background inaudible and starts approaching the three in the

2    dining room]

3    BUSH: Get over here.

4    J.B.: No he didn't, not everyday. He didn't do it everyday.

5    WOODARD: He's OK. He's OK.

6    J.B.: He didn't do it everyday

7    OFFICER WILLIAMS: You're OK.

8    WOODARD: You're OK.

9    OFFICER REILLO: You're OK. Dad is not going anywhere.

10    WOODARD: Dad is not going anywhere.

11    OFFICER REILLO: Everyone just calm down, she just wants to tell you something.

12    BUSH: No, no he's defending me.

13    J.B.: No, he, he..

14    WOODARD: [interrupting] It's OK. Julian, Julian.

15    J.B.: [inaudible]

16    BUSH: Who hurt you in the green house Julian? Who hurt you in the green house?

17    WOODARD: [interrupting] Julian, listen I just need to talk to your dad OK? And this, and that

18    is OK that this is happening. I know this is scary. But you know what I need you to do, I need

19    you to go back over there, K, while I talk to dad, alright?

20      [J.B. starts walking back into the family and Mr. Bush grabs J.B. on the back of the neck]

21    BUSH: This. This. This. This is grabbing. K? This is not assault, this is not battery. This is

22    nothing. OK? This is getting his attention. [Gently pushes J.B. to go back into the family room,

23    J.B. goes back into family room.]

24    Officer Reillo: She just wants to give you her statement, that's all she wants to do.

25    WOODARD: Mr. Bush, listen.

26    OFFICER REILLO: You're not even letting her get her words out.

27    WOODARD: You're not even letting me talk.

28    BUSH: I don't trust you.

2017 D 230075 - 5

FILED DATE: 6/11/2019 11:52 PM    2017D230075

1  OFFICER WILLIAMS: OK, that's fine.

2  BUSH: And I have all the reason in the world, if you would actually sit down and go through

3  my evidence, you would have a reason to know why I don't trust you.

4  OFFICER REILLO: Mr. Bush, she just wants to give you a statement, that's it. That's all she

5  wants to do. We're not here to remove anybody. She just wants to.

6  WOODARD: We're just having a conversation right now.

7  OFFICER REILLO: We're just having a conversation, OK?

8  WOODARD: No we are, cause this is why, this is why.

9  BUSH: Lets have a conversation. Let them take my evidence, cause I have a lot.

10  WOODARD: Listen, OK, I realize you are upset right now.

11  BUSH: Oh I am beyond.

12  WOODARD: I realize this is what is going on. But ultimately I have some concerns based upon

13  the things you are telling me that happened. OK? I am not saying that you are guilty of

14  whatever is going on. But when you tell me that you, yourself did this [motions grab by the

15  back of the neck], I now have to investigate that, and the kids, right now, based on your

16  admission, I need time to do that. The kids need to go somewhere else in order for me to do that

17  because you, yourself by your own admittance said that you grabbed this child's neck. Now, do

18  I know you choked him? I don't know. I need time, but I cannot leave a two-year old..

19  J.B.: [interrupts] My dad did not choke me.

20  WOODARD: This is what I am saying.

21  BUSH: You sons of bitches, you get the hell out of my house. Shame on you.

22  WOODARD: I can't.

23  BUSH: Get out. [raised voice] Get out.

24  WOODARD: I cannot leave.

25  BUSH: You are not welcome in my house. Get out.

26  WOODARD: OK, see I don't want to have to.

27  BUSH: Get out.

28  OFFICER REILLO: Mr. Bush
   2017 D 230075 - 6

FILED DATE: 6/11/2019 11:52 PM  2017D230075

1  OFFICER WILLIAMS: Stop yelling, relax.

2  BUSH: You are not welcome.

3  OFFICER WILLIAMS: Relax.

4  BUSH: You are not welcome, I am a god damn attorney, do you want to see my fucking

5  attorney card?

6  OFFICER WILLIAMS: OK, good.

7  BUSH: Right here asshole, out. I know exactly what my rights are, out.

8  OFFICER WILLIAMS: Good.

9  WOODARD: OK

10  BUSH: Out.

11  WOODARD: So, I got to call my supervisor.

12  OFFICER WILLIAMS: Absolutely.

13  BUSH: I have had it with you people, you stink. Out.

14  OFFICER REILLO: This one?

15  WOODARD: No, this one right here.

16  BUSH: That is what they said about Kavanaugh, Kavanaugh got pissed too, for good reason, get

17  out of my house.

18       6:13 [WOODARD, OFFICERS WILLIAMS AND REILLO ejected into hallway]

19  OFFICER WILLIAMS: There you go.

20  WOODARD: I am going to call my supervisor. [calls her supervisor Marco Leonardo] Sorry,

21  this is. Hey he kicked us out of the house. What am I doing? He kicked me out of the house, he

22  is not, not agreeing to any care plan, I didn't even get that far. Police is right here. What am I

23  doing? And he's saying that I didn't do that and the kids, this was all in front of the kids because

24  he doesn't have a place, this place is a one bedroom, so the kids are all in front, he's yelling

25  talking about how I did this, and he's grabbing the kid while we're there, showing what he did.

26  So I don't know what to say. Yes I did, I talked to mom. Mmm-hmm, mom is supposed to be

27  on her way. What do you mean? I mean this was a, this is an incident that happened, so I don't

28  know, I was trying to investigate the incident, he she is saying that she is trying to limit his time

2017 D 230075 - 7

FILED DATE: 6/11/2019 11:52 PM   2017D230075

1   because he is difficult, not only that, he's uh. But my understanding is the kids said that, this is

2   something that has happened maybe one or two times, not a lot of times, but ultimately I was

3   trying to discuss a care plan and dad just went down super south. So.

4   OFFICER WILLIAMS: Yeah, there should be to the back.

5   WOODARD: Yeah they do have a court, there is a court mandated visit. Yes, absolutely.

6   OFFICER WILLIAMS: Do you have an ID on you?

7   WOODARD: He has the kids today, I believe so.

8   OFFICER WILLIAMS: The DCFS worker.

9   WOODARD: Yes. Yep. Yeah, the GAL, there is already a GAL involved. Sounds good, thank

10  you Marco, appreciate you. Yes, he does. Right, OK, that sounds good. No, no I am definitely

11  going to call Tierney, sounds good. Thank you so much, OK cool sounds good. You said what?

12  I am going to wait for mom? No, right? No, no, no. They were telling me how hot, I was so hot

13  I am burning up it is hot in this apartment and I was, you know, go ahead. So um, OK so that

14  sounds good. Well I'll talk to mom, let her know what the situation is and um I'll move forward.

15  Thanks Marco, I appreciate it. Alright, thanks. Thanks guys, listen.

16  OFFICER REILLO: What's the plan.

17  WOODARD: So the plan is, the father has a court mandated visit, so we don't, obviously we

18  can't supersede that, I am not trying to PC [protective custody] this child, I am not, I was just

19  trying to have a care plan with him but as you can see.

20  OFFICER REILLO: He doesn't want to listen.

21  WOODARD: He doesn't want to listen, I can't even get that far. And just like he just went off

22  with two police officers present for me just suggesting something, I didn't even get that far. Get

23  what I am saying. So that is why I called you guys because I was concerned that was going to

24  happen, I was concerned.

25  OFFICER WILLIAMS: Right, right we came in on the tail end of it, you had already spoken

26  with him.

27  WOODARD: I had already spoken with him.

28  OFFICER WILLIAMS: Right, right, and he had that right to throw us out from his house too.

2017 D 230075 - 8

FILED DATE: 6/11/2019 11:52 PM  2017D230075

1  WOODARD: Exactly. No, no, no. I just wanted you all to be there cause.

2  OFFICER REILLO: Do you have all his information because I am pretty sure he is not going to

3  give it to you.

4  WOODARD: Yeah of course we got all of that.

5  OFFICER REILLO: I am going to do a supplementary report on the assist to.

6  WOODARD: Yeah I definitely have all of that.

7  OFFICER REILLO: In regards to whoever did the first report.

8  OFFICER WILLIAMS: Yeah we need to get that from you. Do you have your file and all that?

9  WOODARD: I don't have the file. What do you mean the file?

10  OFFICER WILLIAMS: With his info and everything?

11  WOODARD: Oh yeah I have that on me right now. Yes, oh yeah I have the app.

12  OFFICER REILLO: Do you want to talk to him or should we go outside where it is warmer?

13  WOODARD: You can literally see everything on the app.

14  OFFICER WILLIAMS: OK so you guys don't carry files around or nothing like that?

15  WOODARD: I can literally see everything on my phone, it's great. It kind of makes it so you

16  know I am not in danger, you know. You know you're carrying stuff, you never know what you

17  are coming into especially in this situation.

18  OFFICER WILLIAMS: OK

19  WOODARD: Sometimes it is just best. So yeah I have all the information. You know, his info.

20  Mom is coming over I am going to talk to her when she gets here.

21  OFFICER WILLIAMS: About how long?

22  WOODARD: Probably in the next, she said in 15 minutes and that was a little while ago. She

23  should be like, she should be almost. Umm, yeah.

24  OFFICER WILLIAMS: Lets do this outside.

25      11:10 [WOODARD, OFFICER WILLIAMS, REILLO walking outside]

26  WOODARD: Lets do this outside, it is so hot in here, it is like scorching. Scorching, I am so

27  hot.

28  OFFICER WILLIAMS: Pause recording.
2017 D 230075 - 9

FILED DATE: 6/11/2019 11:52 PM   2017D230075

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATION OF PETITIONER

Under penalty of perjury as provided by law pursuant to 735 ILCS Section 5/1109 of the Code of Civil Procedure, I certify that the previous set forth in the foregoing report of proceedings are true and correct.

### EDWIN F. BUSH

Edwin F. Bush III. - No. 61448
Attorney at law
8974 N. Western Avenue Suite #114
Des Plaines, IL 60016
(202) 487-8238

2017 D 230075 - 10

# EXHIBIT B

FILED DATE: 6/11/2019 11:52 PM    2017D230075

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| A.B., a minor, R.B., a minor, and ROCHELLE VERMEULEN, in her individual capacity and as mother and next friend for A.B. and R.B., minors, ) ) ) | Case No. 14-cv-07897 |
| ) | |
| Plaintiffs, ) | Hon. Gary Feinerman |
| ) | |
| v. ) | Magistrate Judge Sidney Schenkier |
| ) | |
| CAROLYN HOLLIMAN, et al., ) | |
| ) | |
| Defendants. ) | |

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release, ("Agreement"), is made and entered

into by and between the Plaintiffs A.B. and R.B., by their mother and next friend Rochelle

Vermeulen, and Rochelle Vermeulen (hereinafter "Plaintiffs"), and the Defendants, George H.

Sheldon, Director of the Illinois Department of Children and Family Services ("DCFS"), in his

official capacity, and Carolyn Holliman, Clara Yanes, Rosa Frias, Elizabeth Kimble, and Alexis

Carlisle, in their individual capacities (hereinafter "DCFS Defendants") (Plaintiffs and DCFS

Defendants, collectively, the "Parties").

### RECITALS

WHEREAS, the Plaintiff filed this lawsuit in the United States District Court for the

Northern District of Illinois, Eastern Division, entitled A.B., et al., v. Holliman, et al., Number

14 C 7897, (hereinafter referred to as "Action") alleging violations of rights protected by

statute(s), regulation(s), common law, the Constitution of the State of Illinois and/or the

Constitution of the United States;

WHEREAS, the DCFS Defendants deny the allegations and deny any statutory, common

1

FILED DATE: 6/11/2019 11:52 PM   2017D230075

law, constitutional or regulatory violations, and affirmatively state that the Plaintiffs have failed to state a claim upon which relief can be granted; and

WHEREAS, so as to avoid further expense and in recognition of the positions of the Parties to the above case, the Parties wish to settle and compromise the pending Action, thereby terminating this litigation;

IT IS HEREBY AGREED, by and between the Parties as follows:

In consideration for the full and complete settlement of this claim, the Plaintiffs shall receive the payment of the sum of seventy-five thousand dollars ($75,000.00) (the "Settlement Amount"). The Settlement Amount will be payable from funds available to the Illinois Department of Children and Family Services in Fiscal Year 2016. The Parties understand that the amount payable under this Agreement is subject to state laws governing the State Comptroller's obligation to withhold funds that the Plaintiffs may owe to other persons or to state agencies. The Plaintiffs may contest the validity of these claims through applicable state procedures. Payment of this sum shall be by check payable to the Family Defense Center. Within ten (10) business days after full execution of this Agreement, the Illinois Department of Children and Family Services will submit a request for payment to the Illinois Comptroller for processing.

1.    Plaintiffs will make the following allocation of payment upon approval by the Court:

        a.   For claims of Plaintiff Rochelle Vermeulen: $40,000.00;

        b.   For claims of Plaintiff A.B., a minor: $5,000.00;

        c.   For claims of Plaintiff R.B., a minor: $5,000.00; and

        d.   For the reasonable attorneys' fees and expenses of Plaintiffs' counsel, The Family Defense Center, by Plaintiff Rochelle Vermeulen to The Family Defense Center from that portion of the Settlement Amount that would otherwise be allocated to her for her claims against the DCFS Defendants, pursuant to The

FILED DATE: 6/11/2019 11:52 PM    2017D230075

Family Defense Center's contingent fee agreement with Plaintiffs: $25,000.00.

2.    It is expressly agreed that the DCFS Defendants in their individual capacities shall

not be responsible for payment of any sum under this Agreement.

3.    DCFS will amend its policies and procedures as follows:

a. DCFS will amend Procedures 300 Appendix G ("Appendix G") to clarify that
generalized "risk" alone, without specific information/evidence of a risk of
immediate moderate to severe harm to a child, does not support an "Unsafe"
determination.

b. DCFS will amend Appendix G to further clarify that safety plans should not be
developed unless and until a child protection investigator has determined, based
on all reasonably available information/evidence, that DCFS possesses
information/evidence of an immediate, unmitigated safety threat to a child that
would cause moderate to severe harm to a child unless protective custody is taken.
DCFS will amend Appendix G to further clarify that the above determination is
necessary for a child protection investigator to develop a safety plan with the
child's parent(s) or guardian(s).

c. DCFS will clarify its policies and procedures to provide that parent(s) and/or
guardian(s) shall be given notice of the basis for taking protective custody of their
child or children and that such notice shall be provided to the parent(s) or
guardian(s) by the child protection investigator when developing a safety plan.
DCFS will review its safety plan forms currently in use to ensure consistency with
this Agreement and to determine whether this written notice can be incorporated
as part of the forms DCFS investigators already use.

d. DCFS will clarify its policies and procedures to require that Child Protection
Supervisors shall review every five days each case in which there is an out of
home safety plan to determine whether there remains an immediate, unmitigated
safety threat to a child such that DCFS possesses a basis to take protective
custody. If the Child Protection Supervisor's review determines that there is no
longer an immediate, unmitigated safety threat to a child, the Child Protection
Investigator should terminate the out of home safety plan.

e. DCFS will continue to review safety threats listed on the CERAP and to the
extent a Departmental internal work group is developed to review the CERAP
and safety threats, Plaintiffs' proposals will be provided to that group for
consideration.

f. DCFS will clarify its policies and procedures to reinforce that in investigations
where an individual (who is a parent or guardian) has left a home due to domestic
violence and moved to a new home environment, the child protection investigator

3

FILED DATE: 6/11/2019 11:52 PM    2017D230075

will consider and make a reasonable effort to assist the indidivitual to access the possible options of domestic violence shelter services or the use of Norman Funds prior to the consideration of a safety plan that would separate the parent from his or her child or children, if there are any safety concerns regarding the individual's current living situation for the individual and his or her children.

h. No later than August 1, 2016, DCFS will revise its "Safety Plan Rights and Responsibilities" forms (CFS 1441-D (Safety Plan Rights and Responsibilities for Parents & Guardians), CFS 1441-E (Safety Plan Rights and Responsibilities for Responsible Adult Caregivers and Safety Plan Participants), and CFS 1441-F (Safety Plan Responsibilities for Investigators and Caseworkers)) in accordance with the agreements reached in this matter. DCFS will also incorporate the principles and concepts into Appendix G when it is amended, as discussed above in ¶3.

4.    DCFS will notify its staff upon its issuance of any and all policies revised per this

Agreement. DCFS will effectuate the above referenced changes in procedures and policies by

December 31, 2016. DCFS will complete the training of DCFS investigative staff as to all

policies and procedures revised in accordance with this Agreement within six (6) months after

the revision of the DCFS policies and procedures and in no instance later than June 1, 2017.

DCFS will make this training available to private agency staff.

5.    It is further understood and agreed that the above tendered consideration is not to

be construed as an admission of any liability therefore, such liability having been expressly

denied. No inducements or representations have been made by any agent or attorney of any

party hereby released as to the legal liability or other responsibility of any party claimed

responsible, and it is agreed that this release applies to known or unknown injuries, costs,

expenses and/or damages alleged to have been suffered or incurred by the Plaintiffs due to the

actions or inactions of the Defendants as stated in the Plaintiffs' complaint(s) filed in the Action,

and is intended to be a full and complete disposition of the entire claim(s) and/or cause(s).

6.    The Plaintiffs, their heirs, successors and assigns, agrees to release, and hereby

releases and forever discharge the DCFS Defendants in their individual and official capacities,

4

FILED DATE: 6/11/2019 11:52 PM   2017D230075

the Illinois Department of Children and Family Services and the State of Illinois, their agents,

former and present employees, successors, heirs and assigns and all other persons (hereinafter

"Releasees") from all actions, claims, demands, setoffs, suits, causes of action, controversies,

disputes, equitable relief, compensatory and punitive damages, costs and expenses which arose

or could have arisen from the facts alleged or claims made in the Action, which the Plaintiffs

own, have or may have against the Releasees, whether known or unknown, from the beginning

of time until the effective date of this Agreement, including but not limited to those at law, in tort

(including actions under 42 U.S.C. Section 1983) or in equity.

7.     The Plaintiffs and their attorneys release, waive and relinquish any claims or

rights to attorney's fees, costs and expenses allegedly incurred or due in the Action pursuant to

42 U.S.C. Section 1988, or under any other statute, rule or common law provision.

8.     The Parties agree that the Action shall be dismissed with prejudice and without

attorney's fees, costs or expenses by submitting a fully executed Stipulation to Dismiss to the

Court. The Stipulation to Dismiss shall provide that the Action is dismissed without prejudice;

that Plaintiffs may file a motion to reinstate the action, and the Court may order that the above

release of claims in Paragraph 6 is ineffective, if payment is not issued by the Comptroller within

60 days after submission to the Comptroller for payment; and that in the event no motion to

reinstate is filed on or before October 1, 2016, the case shall be deemed dismissed with prejudice

on the next business day without further order of the Court.

9.     No promise has been made to pay or give the Plaintiffs any greater or further

consideration other than as stated in this Agreement. All agreements, covenants, representations

and warranties, express or implied, oral or written, of the parties hereto concerning the subject

matter of this Agreement are contained in this Agreement. No other agreements, covenants,

5

FILED DATE: 6/11/2019 11:52 PM    2017D230075

representations or warranties, express or implied, oral or written, have been made by any party hereto to any other party concerning the subject matter of this Agreement. All prior and contemporaneous negotiations, possible and alleged agreements, representations, covenants and warranties, between the Parties concerning the subject matter of this Settlement Agreement are merged into this Settlement Agreement. This Agreement contains the entire agreement between the Parties.

10. The Plaintiffs enter into this Agreement as a free and voluntary act with full knowledge of its legal consequences. The Plaintiffs have not relied on any information or representations which are not contained in this Agreement.

11. This Agreement shall be construed and interpreted in accordance with the laws of the State of Illinois, without regard to principles of conflict of laws.

12. This Agreement may not be changed, modified or assigned except by written agreement of the Plaintiffs, the Illinois Department of Children and Family Services and the Illinois Attorney General.

13. This Agreement shall not be construed to constitute a waiver of sovereign immunity of the State of Illinois or the Illinois Department of Children and Family Services.

14. If any provision of this Agreement is declared invalid or unenforceable, the balance of this agreement shall remain in full force and effect.

15. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all counterparts so executed shall constitute one agreement binding on the Parties hereto, notwithstanding that all of the Parties are not signatory to the same counterpart.

FILED DATE: 6/11/2019 11:52 PM  2017D230075

AGREED:

Plaintiff

Date: 6-17-16

Counsel for Plaintiff

Date: 6-17-16

On behalf of Defendants

Date: 6-17-16

Title: Asst atty Gen for Defendant

7

# EXHIBIT C

FILED
6/11/2019 11:52 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2017D230075

5380735

**DEPARTMENT OF CHILDREN AND FAMILY SERVICES**

**POLICY GUIDE 2016.10**

**Replaces PG 2014.20**

**Procedures 300 Reports of Child Abuse and Neglect**
**Procedures 302 Services Provided by the Department**
**Procedures 315 Permanency Planning**

**DATE:**   August 26, 2016

**TO:**   All Child Protection and DCFS/POS Child Welfare Staff and Supervisors

**FROM:**   George H. Sheldon, Director   *Jerry H. Sheldon*

**EFFECTIVE:**   Immediately

## I.   PURPOSE

The purpose of this Policy Guide is to provide Child Protection and Child Welfare staff for with revised and updated Safety Plan Rights and Responsibilities for Parents and Guardians, Safety Plan Rights and Responsibilities for Adult Caregivers and Safety Plan Participants and Safety Plan Rights and Responsibilities for Investigators and Caseworkers. The updated forms provide additional information for parents and caregivers, adult caregivers and safety plan participants and investigators and caseworkers regarding the formulation of the safety plan, the information that needs to be detailed in the safety plan document, the process for modification of safety plans and the process for continual review of safety plans.

The instructions in this Policy Guide will be incorporated into **Procedures 302.250 Paramour Involved Families; 302.260 Domestic Violence; 302.388, Intact Family Services, 302 Appendix A Substance Affected Families; 302 Appendix B Older Caregivers; Procedures 315.110 Worker Contacts and Interventions; Procedures 315 Appendix A CERAP** and **Procedures 300 Appendix G CERAP.**

This Policy Guide is effective immediately.

## II.   PRIMARY USERS

Primary users are all Child Protection Specialists and Supervisors and all DCFS/POS Child Welfare Workers and Supervisors.



1

FILED DATE: 6/11/2019 11:52 PM    2017D230075

### III.    BACKGROUND

#### Procedures 300 Appendix G CERAP/Procedures 315 Appendix A CERAP (Current)

#### Safety Plans

Safety plans are voluntary, temporary and short term measures designed to control serious and immediate threats to children's safety. They must be adequate to ensure the child's safety and be as **minimally disruptive** to the child and family as is reasonably possible. Additionally, families can request that a safety plan be modified or terminated at any time. The safety plan will indicate which safety threat or threats have led to the need for a safety plan according to the completion of the CERAP. The safety plan will require a written description of what will be done or what actions will be taken to protect children, who will be responsible for implementing the components of the safety plan and how/who will monitor it. It is important that safety plans be developed with the family to control specific threats and that the family understands the mechanism for ending each safety plan. **Under no circumstance is a safety plan to serve as the solution to a long-term problem. A family may request at any time to modify or terminate the safety plan.**

When a safety plan is implemented, it should be documented on a **CFS 1441-A, Safety Plan** when it is likely that a child could be moderately or severely harmed now or in the very near future. The safety plan must be developed whenever there are protective efforts that would reasonably ensure child safety and permit the child to remain in their caregiver's custody. After the safety plan has been developed, it must be immediately implemented to ensure that all of the designated tasks are completed effectively. The safety plan should contain timeframes for implementation and continued monitoring.

### IV.    OVERVIEW

Public Act 98-0830 amended Section 21 (f) of the Children and Family Services Act [20 ILCS 505/21] and required the Department or POS caseworker to provide information to each parent, guardian and adult caregiver participating in a safety plan explaining their rights and responsibilities. These updated forms add additional information to the Safety Plan Rights and Responsibilities forms with the following information:

- The investigator and caseworker shall implement a safety plan only when DCFS has a basis to take protective custody of a child(ren) and the safety plan is an alternative to protective custody;
- The investigator and caseworker shall explain to the parent(s)/guardian(s) the safety plan alternatives and that the parent(s)/guardian(s) have a voluntary choice to enter into the safety plan as an alternative to protective custody and to choose the individual(s) responsible for supervising or monitoring the safety plan if such person(s) is/are determined to be qualified by DCFS;
- The investigator and caseworker shall modify the safety plan if the family's circumstances change or if the participants request modifications, including a change in the person(s) preferred by the parent(s)/guardian(s) to supervise or monitor the safety plan or serve as a temporary caregiver;

FILED DATE: 6/11/2019 11:52 PM   2017D230075

- Terminate the safety plan as soon as the investigator and/or supervisor determine there is no longer a legal basis to take protective custody and provide the parent(s)/guardian(s) with the Safety Plan Termination form; and
- The Department or POS representative shall ensure that the safety plan is reviewed and approved by their respective supervisor.

## V.   INSTRUCTIONS

Effective immediately:

- Child Protection and Child Welfare staff shall provide the parent, guardian and adult caregiver participating in a safety plan with a copy of the **CFS 1441-A, Safety Plan** that has been signed by all adult participants and the DCFS/POS representative;

**Note:** Department and POS staff must use only the **CFS 1441-A, Safety Plan (Rev 12/2014)** that has been revised to meet the requirements of PA 98-0830.

- The Department or POS representative shall provide each parent/guardian, adult caregiver and safety plan participant with information explaining their rights and responsibilities including, but not limited to: information for how to obtain medical care for the child, emergency contact information for participants including phone numbers and information on how to notify schools and day care providers of safety plan requirements. The rights and responsibilities of each parent/guardian, adult caregiver, safety plan participant and child protection/child welfare staff are listed in new forms **CFS 1441-D, Safety Plans Rights and Responsibilities for Parents and Guardians; CFS 1441-E, Safety Plan Rights and Responsibilities for Responsible Adult caregivers and Safety Plan Participants; CFS 1441-F, Safety Plan Responsibilities for Child Protection Specialists and Child Welfare Caseworkers.** All **CFS 1441** forms are available in central stores, templates, and the website; and

- After receiving verbal supervisory approval of the safety plan prior to leaving the family home, the Department or POS representative shall submit the signed **CFS 1441-A** to their respective supervisor for review and approval.

## VI.   ATTACHMENTS

**CFS 1441-D, Safety Plans Rights and Responsibilities for Parents and Guardians (Revised 08/2016);**

**CFS 1441-E, Safety Plan Rights and Responsibilities for Responsible Adult caregivers and Safety Plan Participants (Revised 08/2016); and**

**CFS 1441-F, Safety Plan Responsibilities for Child Protection Specialists and Child Welfare Caseworkers (Revised 08/2016).**

FILED DATE: 6/11/2019 11:52 PM   2017D230075

Please note that the **CFS 1441-A** is printed on a 6 Part form and available from Central Stores. The **CFS 1441-D – F** are printed on regular paper and available from Central Stores, DCFS Website and T drive. All forms will be available in Spanish.

**VII.   QUESTIONS**

Questions regarding this Policy Guide may be directed to the Office of Child and Family Policy at 217-524-1983 or via Outlook at OCFP – Mailbox. Non Outlook users may e-mail questions to cfpolicy@idcfs.state.il.us.

**VIII.   FILING INSTRUCTIONS**

Remove and replace Policy Guide 2014.20 with this Policy Guide immediately after **Procedures 302.250 Paramour Involved Families; Procedures 302.260 Domestic Violence; Procedures 302.388 Intact Family Services; Procedures 302 Appendix B Older Caregivers; Procedures 315.110 Worker Contacts and Interventions; Procedures 315 Appendix A CERAP and Procedures 300 Appendix G CERAP.**

# EXHIBIT D

CFS 1441-D
Rev 5/2019

FILED
6/11/2019 11:52 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2017D230075

5380735

State of Illinois
Department of Children and Family Services

## SAFETY PLAN RIGHTS AND RESPONSIBILITIES FOR PARENTS & GUARDIANS

As Parents/Guardians, you have the right to:

- Only be asked to agree to a safety plan if there has been a determination by DCFS, approved by a DCFS supervisor, that DCFS possesses legally sufficient grounds for protective custody;
- Be informed in writing of the basis for the DCFS determination that there is an immediate and imminent threat of moderate to severe harm to your child(ren) as set forth in the safety plan;
- Refuse to enter into a safety plan arrangement for your child(ren), understanding that DCFS will then assess whether protective custody is necessary to protect your child(ren) from immediate harm;
- Provide information to DCFS that relates to the basis for finding the presence of an immediate safety threat;
- Inform DCFS of circumstances that the parent(s) or caregiver(s) believe mitigates or reduces the identified safety threat;
- Voluntarily participate in the development of a safety plan, including identifying conditions that would protect your child(ren) from harm while allowing the family to continue living together and/or identifying temporary caregivers for your child(ren);
- Request the safety plan be modified at any time and have the modification to the safety plan agreed to or approved if the modification continues to assure the safety of the child(ren);
- Terminate the safety plan at any time, knowing that if you do so without the agreement of DCFS, the investigator will evaluate whether DCFS continues to have grounds for protective custody and if grounds continue to exist, DCFS can take protective custody if necessary to protect the child(ren) from immediate harm or offer a different safety plan that adequately protects the child(ren);
- Receive a copy of the signed safety plan and any subsequent modifications of the safety plan;
- Maintain contact with your child, as long as that contact does not threaten the immediate safety of the child from moderate to severe harm;
- Have a supervisor conduct a review every five days to assure that there continues to be a basis to take protective custody of the child(ren) and of the continued need for the safety plan;

FILED DATE: 6/11/2019 11:52 PM 2017D230075

- Retain all of your rights to direct your child(ren)'s upbringing, including directing a specific individual to be a supervisor or monitor of the safety plan if such person is deemed qualified by DCFS;
- Know the length of time a safety plan will be in place, as safety plans are intended to be temporary, short term efforts to ensure the safety of your child(ren);
- Know that if the safety plan is violated, DCFS will evaluate whether it continues to have grounds to take protective custody of your child(ren) and if grounds continue to exist, DCFS can take protective custody if necessary to protect the child(ren) from immediate harm;
- An opportunity to consult with legal counsel prior to signing any safety plan form or regarding any safety plan; and
- Contact the DCFS Advocacy Office at 800-232-3798 or 217-524-2029 to seek assistance or make a complaint.

As Parents/Guardians, you have the responsibility to:

- Continue to provide medical care and financial support for your child(ren) if someone else is providing temporary care under a safety plan;
- Decide whether to provide information to the DCFS investigator/caseworker about your mental health, substance use, and domestic violence issues or any other circumstances which might impact the safety of your child(ren) with the understanding that the decision not to provide information may be a factor that DCFS considers in determining whether DCFS possesses legally sufficient grounds to take protective custody of your child(ren) or request a safety plan;
- Inform the investigator/caseworker immediately if you have any concerns or problems with the safety plan requirements;
- Notify the investigator/caseworker of changes to your contact information to ensure you can be reached if a decision is needed regarding your child(ren);
- Ensure the person providing temporary care for your child(ren) has your current contact information in the event parental consent is needed for medical treatment or other emergencies;
- Inform DCFS if there are custody orders in place which may be impacted by the safety plan; and
- Notify schools and/or daycare providers of any changes there may be with respect to coordinating the child(ren)'s attendance and drop-off or pick-up schedules.